JACOB BRÖGGER AND OTHERS v. CHICAGO, ST. PAUL, MINNEAPOLIS & OMAHA RAILWAY COMPANY.[1]

June 29, 1917.

Nos. 20,451—(231).

**Railroad and Warehouse Commission — village station — validity of order.**

1. The Omaha Railway Company maintained a depot including a ticket and passenger station near the business center of the village of Butterfield for several years. After another railway company had constructed another railroad intersecting the road of the Omaha company a short distance outside the village limits, the two companies installed and maintained a joint ticket and passenger station at the junction, and the Omaha Company discontinued the use of its old depot for passenger business. On due application the Railroad and Warehouse Commission required the company to re-establish a ticket and passenger station at the old depot and to stop certain trains thereat, and also to stop the same trains at the junction station on flag. *Held* that requiring the maintenance of a ticket and passenger station at the old depot and the stoppage thereat of local trains is not unreasonable or unlawful, but that it is unreasonable to require such trains also to stop at the junction station on flag.

**Same — evidence.**

2. In determining whether the safety and convenience of the public will be promoted by a passenger service at the old depot, the commission may take into consideration the inconvenience and dangers attending the use of the junction station, and the fact that the business buildings of the village were, for convenience, constructed near the old depot while that depot was in use.

**Same — exclusion of evidence.**

3. A petition to extend the village limits so as to include the junc-

[1]Reported in 163 N. W. 662.

tion station within the village, made and rejected after the hearing before the commission, was properly excluded from the evidence presented to the court.

**Same — no estoppel from former orders.**

4. The denial of two prior applications to re-establish passenger service at the old .depot, made fifteen years ago, does not operate as an estoppel or bar to the present application.

**Same — interstate commerce unaffected.**

5. As only those trains which stop at way stations are required to stop at the old depot and such trains cannot be required to stop at the junction station, the burden upon interstate commerce is not materially increased.

J. Brogger, John F. Enns and others petitioned the Railroad and Warehouse Commission for an order requiring the Chicago, St. Paul, Minneapolis & Omaha Railroad Company to establish and maintain a ticket office and passenger depot in the village of Butterfield. After hearing, the Railroad and Warehouse Commission granted the petition and the railway company appealed to the district court for Watonwan county. The. appeal was heard before Comstock, J., who made findings and affirmed the order of the commission. From the judgment entered pursuant to the order for judgment, defendant appealed. Affirmed.

*George W. Peterson* and *James B. Sheean,* for appellant.

*Lyndon A. Smith,* Attorney General, *Henry C. Flannery,* Assistant Attorney General, and *J. L. Lobben,* for respondent.

TAYLOR, C.

For many years, the Omaha Railway Company has operated a line of railroad running in an easterly and westerly direction through the village of Butterfield in Watonwan county. Prior to 1899, it maintained a passenger and freight station near the center of that village which . is designated in the record as the old depot. In that year, the North-Western Railway Company constructed a line of railway running in a northerly and southerly direction which intersected the line. of the Omaha Company at a point about 2,400 feet east of the old depot of the latter company, and slightly more than 1,000 feet east of the

easterly boundary line of the village. A union station was constructed at this junction which has ever since been used by both companies for receiving and discharging passengers. The Omaha Company continued the use of the old depot for freight purposes, but discontinued its use for passenger purposes, and stops none of its passenger trains thereat. A joint agent at the new station attends to the business of both companies at Butterfield. In 1915, a petition was filed with the Railroad and Warehouse Commission by residents of Butterfield, asking that the Omaha Company be required to provide and maintain a ticket office and passenger depot within the village and to stop its passenger trains thereat for the purpose of receiving and discharging passengers. A hearing was duly held by the commission, and as a result thereof, the commission among other things found it "to be reasonable to require respondent to stop its passenger trains at the location of the old depot and provide for the sale of tickets, proper shelter for passengers, and checking and care of baggage, and that it will be reasonable to stop at the Union depot on flag;" and made an order requiring the company to do so. The company appealed to the district court. At the trial in district court a considerable quantity of evidence was presented in addition to that submitted at the hearing before the commission. The district court made findings of fact and conclusions of law, and rendered judgment, "that said appellant, Chicago, St. Paul, Minneapolis and Omaha Railway Company shall at the village of Butterfield in Watonwan county, Minnesota, and at the so-called 'old depot,' within the corporate limits of said village of Butterfield, stop such of its passenger trains as are now required by law to stop at way stations in said state for the convenience of the traveling public, and provide for the sale of tickets, the checking of baggage and the reasonable convenience of passengers thereat." An appeal from this judgment brings the matter before this court.

The legislature has authorized the Railroad and Warehouse Commission to determine what transportation facilities are reasonably necessary for the accommodation of the public, and to require railroad companies to furnish such facilities; and also has authorized it to require, from time to time, any reasonable change in such facilities which "will promote the security or convenience of the public." This power is legis-

lative and administrative in its nature, and, in reviewing the orders of the commission issued thereunder, the courts cannot substitute their own judgment, as to the necessity or propriety of a proposed change, for that of the commission, but must confine themselves to a determination of the judicial questions committed to them.    State v. Great Northern Ry. Co. 130 Minn. 57, 153 N. W. 247; State v. Great Northern Ry. Co. 123 Minn. 463, 144 N. W. 155.

Section 4192, G. S. 1913, prescribing the effect to be given by the courts to the findings and order of the commission in such matters and the duty of the courts in respect thereto, provides: "Such findings of fact shall be *prima facie* evidence of the matters therein stated, and the order shall be *prima facie* reasonable, and the burden of proof upon all issues raised by the appeal shall be on the appellant.    If said court shall determine that the order appealed from is lawful and reasonable, it shall be affirmed and the order enforced as provided by law.    If it shall be determined that the order is unlawful or unreasonable it shall be vacated and set aside."

The company contends that the changes required are unreasonable and unlawful, in that they require additional service, and will impose an unlawful burden upon it by necessitating large expenditures which will produce no additional revenue.

There is only one public road from the village to the new or union station.    This road is wholly unimproved outside the village, runs over low, wet ground, and at certain seasons of the year is impassable.    The railway companies have provided a cinder path from the village limits to the new station for pedestrians; but the commission found that this path "was a foot under water for at least three weeks" in the spring preceding the hearing.    Passenger trains stop at this station both in the daytime and in the night-time; some stop regularly; others only under certain conditions.    The companies have an agent and helper at the new station during the daytime, but have no one there at night. The waiting rooms remain open during the night, and before leaving the agent lights a lamp and in the winter also replenishes the fire.    The towerman stationed in a tower located across both railroad tracks from the station building is supposed to keep up the fire, but the evidence shows that passengers arriving on night trains frequently find neither

light nor fire. The house of the section boss, which is located on the opposite side of the station building from the public road, is the only house in the vicinity, and travelers arriving on night trains have lost their way while trying to go from the depot to the village. "Hoboes" congregate at the depot and pass the night in it, and the commission found: "There is no police protection at the Union station and it is a dangerous place for passengers to alight on dark nights. Although the station building is kept open for the arrival of trains, it has not been kept lighted and there have been some hold-ups and robberies there. Conditions have been so bad that traveling men are afraid to make the station on night trains on account of its not being safe."

The company insists that the commission erred as a matter of law in taking these conditions into consideration in making its order; that if the public road is defective, and the place unsafe for lack of police protection, these conditions result from the neglect of the public authorities, and should be given no weight in determining whether a change ought to be made in the location of the station. We think this position not well taken. This station is intended for the accommodation of the residents of the village and of others who have occasion to travel to or from the village. The defective road is outside the village, and no duty rests upon the village to improve it; the station is also outside the village and beyond its policing jurisdiction. In view of these facts, we think that the conditions actually found to exist at this station may be taken into account in determining whether it affords reasonably safe and convenient accommodations for the traveling public at this village. It also appears that the railway company which constructed this line of railroad, and to whose interests the Omaha Company has succeeded, originally owned and platted the townsite upon which the village is situated; that this plat shows the station located at the place where the old depot stands; that the lots were sold according to this plat; and that the business buildings of the village were constructed after the construction of the original depot and were located near it as a matter of convenience. These facts, while not of controlling importance, may well have been taken into consideration by the commission, especially as residents of the village have made at least two prior attempts to have trains again stop at the old depot. The Omaha Com-

pany runs several passenger trains over its line each way daily, while the Northwestern Company runs only one train over its line. The evidence tends to show that the travel to and from the village is mostly over the Omaha line, and that a station located where the old depot stands would afford more convenient facilities for such travel than the Union station. In opposition to the showing made by the village, the company presented evidence tending to show that about three-fourths of the passenger business at Butterfield is derived, not from passengers to and from the village, but from passengers traveling from some point on one railroad line to some point on the other line, who change from one line to the other at Butterfield; that the additional expense of operating both stations as passenger stations would be about $1,500 per year; and that the expense of fitting up the old depot as a passenger station would be about $5,000. The village does not ask for improvements or additional accommodations at the old depot, but improvements to some extent will doubtless be necessary if passengers are received and discharged there.

The trial court found that Butterfield is an incorporated village having over 400 population; that the revenue of the Omaha Company from the sale of passenger tickets at the village is approximately $7,000 per annum; that its revenue from the freight business of the village exceeds $18,000 per annum; that the old depot is of substantial construction, and with some modification and repairs will afford sufficient and convenient facilities for a passenger station; that the additional expense of maintaining a ticket and passenger station at the old depot will be approximately $1,500 per year, not counting the cost of stopping trains nor the cost of improvements and repairs; and that it is reasonable to require the company to maintain a ticket and passenger station within the village at the old depot and to stop passenger trains thereat. The court made no specific finding as to the expense of making the necessary modifications and repairs in the old depot, but apparently was of opinion that it would not be sufficient in amount to be a controlling element in the case. Its estimate of the additional expense is based upon the supposition that a ticket and passenger station will be maintained at both depots. The judgment requires the stopping at the old depot of only those trains which are required by law

to stop at way stations; and, in view of the rules governing this court in reviewing such matters, we cannot say that requiring the company to maintain a ticket and passenger station at the old depot, and to stop thereat trains which stop at way stations, is either unreasonable or unlawful. While this change will entail some additional expense upon the company, and perhaps may not materially increase its revenue, such incidental loss is not so great as to justify us in saying that these facilities cannot reasonably be required. Atlantic C. R. Co. v. North Carolina Cor. Comm 206 U. S. 1, 27 Sup. Ct. 585, 51 L. ed. 933, 11 Ann. Cas. 398.

After the commission had made the order which is in question, the two railway companies and a subsidiary company, which holds the title to the land involved, made a petition to extend the village limits so as to include within the village the Union station and the land lying between the station and the present village limits, but the petition was rejected and the village limits were not extended. At the trial of the appeal in the district court, the court refused to receive this petition in evidence. The company complains of this ruling, but we think it was correct.

The company insists that the denial of the two prior applications, made in the year 1900, to have passenger service re-established at the old depot operates as an estoppel and a bar to the present application. We cannot so hold. It does not appear that the conditions are the same now that they were then, and the statute authorizes the commission to require any reasonable change of the station, or of the mode of operating the road, whenever in its judgment such change "will promote the security or convenience of the public." G. S. 1913, § 4178. The orders made 15 years ago are not a bar to this proceeding.

The company insists that it is unreasonable to require the stopping of a passenger train at both the old depot and the Union station, which are no more than half a mile apart. We think the company is correct in this contention. The amount of travel to and from this village is not large, and we think the company cannot reasonably be required to stop the same train at two different stations at this village for the accommodation of such travel. Whether the company may wholly discontinue the use of the Union station, and maintain a ticket and pas-

senger station only at the old depot, is not involved nor determined herein. The order of the commission provided that trains required to stop at the old depot should also stop at the Union station on flag. This latter provision cannot be sustained. The judgment of the district court, in one paragraph thereof, adopts and affirms the order of the commission in all respects; but, in the paragraph which sets forth explicitly what is adjudged and determined, it omits the provision that a train which stops at the old depot shall also stop at the Union station if flagged. To avoid ambiguity the judgment will be modified by striking therefrom the paragraph purporting to adopt and affirm the order of the commission "in all respects."

The company also insists that the trains passing through this village are engaged in interstate commerce, and that the requirements of the commission will impose an unlawful burden upon such commerce. This might be true if such trains were required to stop at both stations, but that requirement has been eliminated as unreasonable. As the order as modified requires the stopping at the old depot of only those trains which stop at way stations, and such trains are not required to stop at the other station (unless the company so elects), we think the burden upon interstate commerce is not materially increased.

The judgment of the district court as above modified is affirmed.

On October 12, 1917, the following opinion was filed:

PER CURIAM.

Defendant applied for a reargument on the ground that section 4407, G. S. 1913, requires it to stop its passenger trains at the crossing and that this statute had inadvertently been overlooked.

This statute as originally enacted in 1872 read as follows: "When railroads within this state intersect or cross each other and either road has a regular or permanent station and passenger trains are due at the same hour, the train first arriving shall wait for the arrival of the other, if it comes within five minutes; and each of such roads shall afford suitable opportunities for passengers desiring it to change with their baggage from one train to the other; and the superintendent, conductor and engineer of the railroad violating the provisions of this act, who shall

knowingly or willingly cause or permit the train to pass intersection or a crossing with another railroad, without affording the opportunity for change of passengers with their baggage as aforesaid, shall upon conviction thereof be deemed guilty of a misdemeanor, and shall be subject to a fine of not less than five hundred dollars for each and every offense." Laws 1872, c. 24, § 1.

The statute remained in that form until the revised laws of 1905 changed it to its present form which is as follows:

"Trains shall stop at all junctions and railroad crossings where transfer of passengers is required as at stations, and, as far as can reasonably be done, companies shall so adjust their time tables as to facilitate such transfer. In case trains on intersecting roads are due at any such junction or crossing at practically the same time, within two minutes of each other, the train first arriving shall wait for the other train five minutes, unless it is known that such train cannot arrive within said time. Any superintendent, engineer, conductor, or other officer or employee of any railroad company who shall violate any of the provisions of this section or cause a violation thereof, shall be guilty of a gross misdemeanor." G. S. 1913, § 4407.

It is clear that the original statute required the stopping of passenger trains at a railroad crossing only when two trains—one upon each road —were due at the crossing at practically the same time, and that the purpose of the statute was to afford passengers a reasonable opportunity to transfer from one train to the other. In the revision, the language of the statute was changed so that its meaning is less clear, but we discover no intention to change the purpose to be accomplished.

In the present case it does not appear that any train of the Omaha Company required to stop at the old depot is due at the crossing at or about the same time that a passenger train of the Northwestern Company is due thereat. The one passenger train of the Northwestern Company runs in the daytime. So far as appears a passenger arriving upon the train of one company and desiring to take the next train of the other company in either direction has ample time to go from one depot to the other and take the desired train.

As the trains of the intersecting roads are not due at the crossing sufficiently near the same time to require them to wait for a transfer of passengers from one to the other, and as passengers arriving upon one road have a reasonable opportunity to take the next train of the other road if they wish, we are of opinion that this case is not within the purview of the statute cited, and that it does not require the trains in question to stop at this crossing.

Reargument denied.