STATE, RAILROAD AND WAREHOUSE COMMISSION, AND
OTHERS v. MINNEAPOLIS & ST. LOUIS RAILROAD
COMPANY AND ANOTHER.[1]

March 21, 1941.

Nos. 32,633, 32,634, 32,636, 32,637, 32,836, 32,837, 32,838, 32,839.

[1]Reported in 297 N. W. 189.

*J. A. A. Burnquist,* Attorney General, and *George T. Simpson,* Assistant Attorney General, for the State and the Railroad and Warehouse Commission.

*Stinchfield, Mackall, Crounse & Moore,* for appellants Steller Transportation Company, Waconia Motor Express, and Minnetonka Transfer Company.

*Jackson & Yackel,* for appellant Murphy Motor Freight Lines, Inc.

*George L. Siegel,* for appellant Brotherhood of Railroad Trainmen.

*D. C. Edwards* and *Richard Musenbrock,* for respondents.

PETERSON, JUSTICE.

The receiver of the Minneapolis & St. Louis Railroad Company applied to the railroad and warehouse commission for a certificate of public convenience and necessity under L. 1925, c. 185 (1 Mason Minn. St. 1927, §§ 5015-1 to 5015-19), authorizing the railroad to operate as an auto transportation company over certain public highways which run parallel to its lines. The proposed operation was for the transportation of freight in less than carload lots by motor truck serving approximately 27 communities on the railroad's lines. One of these lines extended westerly from Minneapolis through Chaska and intermediate points to Winthrop. One extended southerly from Minneapolis through Chaska, Jordan, and intermediate points to Albert Lea.

The Steller Transportation Company, which served some of the points on the westerly route at the time the railroad filed its application, applied for an additional certificate to serve the points on the route not then served by it and offered to give such further transportation service as the commission should order. The Mur-

phy Motor Freight Lines, Inc., which at the time served some points on the southerly route, filed an application for a certificate of public convenience and necessity to serve all points which the railroad proposed to serve along that route, and offered to furnish service as the commission should order.

There was a joint hearing on all the applications. The railroad opposed the applications of the auto transportation companies. The Steller and Murphy companies opposed the application of the railroad and were joined in that effort by the Minnetonka Transfer Company, Waconia Motor Express, and the Brotherhood of Railroad Trainmen. For convenience, we shall refer to the parties as the railroad, Steller, Murphy, Waconia, Minnetonka, and the Brotherhood.

There was testimony that four of the municipalities had a population in 1930 in excess of 2,000; that eight had a population in excess of 1,000; that 13 had a population of less than 1,000; that two had a population of 100 or less; and that the population of these municipalities had not materially changed since 1930.

The showing as to public need and convenience was not as explicit as it might have been in respect to either the amount of available business or the character and frequency of the transportation service at the points named in the application.

The railroad's avowed purpose was to retain its less-than-carload-lot (l.c.l.) freight business and to recapture some of that business which it had lost to other forms of transportation. Its witness Conley testified that in 1918 such business amounted to about 317,000 tons and that it had decreased to approximately 200,000 tons in 1928 and 61,000 tons in 1938. He testified further that the decrease may be attributable more or less to changes in the mode of transportation to which motor trucks have contributed to a large extent. While the testimony was that the railroad has lost much l.c.l. freight business, it did not show the volume and character of such business as of the time of the hearing nor did it show how much was carried by motor trucks.

The existing service was shown to be in part by rail and truck.

On the westerly route the rail service consisted of one local freight train which departed at 7:30 a. m. from Minneapolis and arrived at Winthrop at 1:15 p. m. on Mondays, Wednesdays, and Fridays, serving intermediate stations on the outbound trip. During the night a fast freight train transported freight to Winthrop to be delivered along the route on the following Tuesdays, Thursdays, and Saturdays respectively. On the return trip on those days leaving Winthrop at 10:30 a. m. and arriving in Minneapolis at 3:05 p. m. such deliveries were made. Under the arrangement all communities on the westerly route had daily railroad freight service from Minneapolis, the deliveries being made by the outbound train on Mondays, Wednesdays, and Fridays and by the inbound train on Tuesdays, Thursdays, and Saturdays. The time of arrival at and departure from the intermediate points was not shown.

There was daily freight service over the southerly route consisting of a train leaving Minneapolis at 7:30 a. m. which terminated at New Prague and another train which left Albert Lea at 6:55 a. m. and later at about 8:30 or 9:00 a. m. and terminated at New Prague. The southbound trip was completed at Albert Lea at about 3:30 in the afternoon, and the northbound trip at Minneapolis at 2:40 p. m. Just what the arrangement was at New Prague is not clearly shown, but we infer that the train and crew from Minneapolis took over the business from the south at New Prague on its return trip to Minneapolis, and that the train and crew from Albert Lea took over the business of the train and crew from the north on its return trip south. The time of arrival and departure of the trains at the intermediate stations was not shown.

There was testimony that trucking freight service was general throughout the territory under consideration. Conley's testimony was that trucking activities "beyond the control of the people of these communities and the railroad have come into the railroad territory and have contributed to a large extent to this lessening of this merchandise traffic," and that large trucks rendering store-

door service piled freight on the sidewalks or in the doorway of the consignee's building and were a traffic hazard when "moving through densely populated parts of the town at hours when traffic hazards may be high." Some of the shippers gave testimony that permit carriers hauled merchandise from St. Paul and Minneapolis to different points on the railroad's proposed truck operation. In addition, the testimony was that there was considerable trucking service by livestock haulers and others. For example, Conley further testified: "There is a lot of 35-mile [zone] operation along there, and livestock haulers that bring back merchandise for nothing, or little or nothing. We were told that by the people at Montgomery." On the westerly route, Steller, Minnetonka, and Waconia have daily service to all points except Hamburg, Green Isle, Arlington, Gaylord, and Winthrop. Steller offered to serve all these points. It had made three prior applications to serve Gaylord and Winthrop, through which its lines operate, but each application was denied upon the ground that there was no public need and convenience for the additional service because of the adequacy of the railroad service. Arlington was shown to have truck service by two motor truck transportation companies.

There was no showing of public convenience and necessity for the one-half of the proposed service comprised of that from outlying points to Minneapolis, because the record was entirely silent with respect thereto.

The testimony relating to public need and convenience was confined to freight service from St. Paul and Minneapolis to the outlying points on both the westerly and southerly routes. Some witnesses testified that the proposed service was necessary. Many testified that it would improve the existing service. Some testified that they did not use the present available truck service, but that if the railroad were given a certificate to engage in the auto transportation business they would use its service. Many of these witnesses testified that they would not use trucking service if the certificate were not granted to the railroad. They expressed the

opinion that the railroad was essential to the communities and should have available transportation revenue.

Some 72 witnesses testified that there was no need for additional transportation service. Some of them stated that they were satisfied with the existing service by rail, truck, express, and mail.

Some of the witnesses (at least ten) called by the railroad labored under a misapprehension as to the character of the service rendered by the railroad over its westerly line. They had the impression that the railroad rendered a triweekly service on Mondays, Wednesdays, and Fridays for the reason that a way freight left Minneapolis on each of those days westbound, and returned on Tuesdays, Thursdays, and Saturdays. They assumed that the only service to Minneapolis from those communities was that rendered by the outgoing train.

Many witnesses (at least eight) who testified that the proposed service was needed or would be convenient said that they were not familiar with existing service except in a general way.

The commission found, among other things, that the present rail and truck service was sufficient to care for all the required transportation needs of the public in each of the municipalities mentioned; that there was no public convenience and necessity warranting the granting of the railroad's application; and that the granting of such an application would necessarily affect adversely the service of established truck operations. The commission denied the application.

The railroad appealed to the district court, where the case was submitted upon the record made before the commission without taking any further testimony. The court made findings of fact opposed to those of the commission that public convenience and necessity required that the railroad's application be granted and concluded that the order of the commission denying the railroad's application was unlawful and unreasonable, and ordered it vacated and set aside. It directed the commission to take further proceedings in accordance with its order and that judgment be entered accordingly. The state of Minnesota, the commission, Steller,

Waconia, Minnetonka, Murphy, and the Brotherhood appeal from the judgment.

■ The application of a railroad for a certificate of public convenience and necessity under L. 1925, c. 185, stands upon the same basis as that of any other applicant. C. & N. W. Ry. Co. v. Verschingel, 197 Minn. 580, 268 N. W. 2, 709; N. Y. Cent. R. Co. v. P. U. C. of Ohio, 123 Ohio St. 370, 175 N. E. 596.

■ Public convenience and necessity for the railroad's proposed service was a fact question for the commission.

The word "necessity" is used in the act not in its lexicographical sense as being indispensably requisite, nor as synonymous with the word "convenience," but as contemplating a definite public need for a transportation service for which no reasonably adequate public service exists. C. & N. W. Ry. Co. v. Verschingel, 197 Minn. 580, 268 N. W. 2, 709, *supra;* Canton-East Liverpool Coach Co. v. P. U. C. of Ohio, 123 Ohio St. 127, 174 N. E. 244.

The commission is required to find only the ultimate fact of public convenience and necessity, C. & N. W. Ry. Co. v. Verschingel, *supra,* but it is required by 1 Mason Minn. St. 1927, § 5015-8, in determining whether or not a certificate should be issued, to give reasonable consideration to the interests of the public that might be affected thereby, to the transportation service furnished by any railroad, to the likelihood of the proposed service being permanent and continuous throughout the year, to the effect which such proposed service might have upon other forms of transportation service which are essential and indispensable to the communities to be affected by such proposed service, to the traffic already existing upon the route proposed to be traveled, to the effect that such proposed service may have upon existing travel upon said route, and to the excess cost of maintaining public highways on account of the installation of such service.

The findings and the record show that the commission gave consideration to matters which the law required it to consider in determining the question of public convenience and necessity.

The evidence relating to the proposed service from Minneapolis to outlying points failed to show such public need and convenience as a matter of law. The large amount of testimony to the effect that while such service was convenient it was not necessary did not meet the requirement of the statute that there must be both public convenience and necessity. Almost every additional service is a convenience. Mere convenience does not satisfy the statute; there must be both public convenience and necessity. Canton-East Liverpool Coach Co. v. P. U. C. of Ohio, 123 Ohio St. 127, 174 N. E. 244, *supra*. Much of the testimony was of no probative value because of the witnesses' lack of knowledge concerning the matters to which their testimony related. Much more testimony showed that there was no need for such service in any event.

The evidence supported the finding that public convenience and necessity did not require the service covered by the railroad's application.

■ The rule governing the court in reviewing an order of the commission on appeal is prescribed by 1 Mason Minn. St. 1927, § 4651, which provides:

"Such findings of fact shall be prima facie evidence of the matters therein stated, and the order shall be prima facie reasonable, and the burden of proof upon all issues raised by the appeal shall be on the appellant. If said court shall determine that the order appealed from is lawful and reasonable, it shall be affirmed and the order enforced as provided by law. If it shall be determined that the order is unlawful or unreasonable it shall be vacated and set aside."

The rule of review is the same as that of an appellate court in reviewing the findings of a jury. Abrahamson v. C. N. Ry. Co. 177 Minn. 136, 225 N. W. 94.

■ The power to issue certificates of public convenience and necessity is legislative and administrative in character. That function has been delegated by law to the commission. The district court does not have the power on appeal or otherwise to exercise

legislative or administrative power. On appeal from an order of the commission the court examines the whole matter in controversy to determine whether the evidence reasonably tends to support the findings of fact upon which the order must be based and to examine the questions of law arising from such facts. In deciding an appeal, the court, for lack of power, does not assume to exercise the functions of the commission and to substitute its own findings for those of the commission. Nor does it act on its own conception of the wisdom of the order brought before it for review. It decides only the judicial questions whether the order is reasonably supported by the evidence and whether it is lawful and reasonable. It does not try the case *de novo*. State v. Tri-State T. & T. Co. 204 Minn. 516, 284 N. W. 294; C. & N. W. Ry. Co. v. Verschingel, 197 Minn. 580, 268 N. W. 2, 709, *supra;* Steenerson v. G. N. Ry. Co. 69 Minn. 353, 72 N. W. 713.

The lawfulness and reasonableness of the commission's order is to be tested by whether it kept within its jurisdiction, whether in arriving at its decision it was guided by the controlling rule of law (in this case the statute) or acted capriciously and at pleasure, and whether the evidence fairly supports the findings on which its conclusions rest. See Bennett v. Beaty, 156 Minn. 293, 194 N. W. 627, and Brazil v. County of Sibley, 139 Minn. 458, 166 N. W. 1077. Where, as here, the commission in making an order concededly within its jurisdiction applied the applicable statute to the evidence, which was sufficient to support its findings, and was guided by the statutory provisions in arriving at its conclusions, it cannot be said that the order was not lawful and reasonable.

Our conclusion is that the commission's order was supported by the evidence and should have been affirmed by the district court. It was error for the court to substitute its findings for those of the commission.

Reversed.