STATE AND PORT AUTHORITY OF ST. PAUL v. NORTHERN
PACIFIC RAILWAY COMPANY AND OTHERS.[1]

August 5, 1949.

No. 34,814.

---

314

See, 221 Minn. 400, 22 N. W. (2d) 569.

*J. A. A. Burnquist,* Attorney General, *George T. Simpson,* Special Counsel, for appellant State of Minnesota.

*Bruce J. Broady,* Corporation Counsel, and *William M. Serbine,* Assistant Corporation Counsel, for appellant Port Authority of St. Paul.

*Conrad Olson, P. F. Gault, Guy A. Gladson, L. E. Torinus, Jr., W. J. Quinn, A. O. Bjorklund, Eldon M. Martin, Richard Musenbrock, Philip Stringer, C. L. Taylor, C. O. Newcomb, S. W. Rider, Jr.,* and *A. C. Erdall,* for respondents.

MATSON, JUSTICE.

Appeal from a judgment of the district court vacating, as unreasonable and unlawful, an order of the state railroad and warehouse commission (hereinafter called the commission) fixing maximum *intrastate* rates to be charged by carriers for the switching of carload traffic from points on the tracks of the barge terminal owned and operated by the Port Authority of the city of St. Paul to industries and connecting tracks located within an area designated by the commission as the St. Paul switching district.

We are primarily concerned with the fundamental issue of whether, *in the light of the evidence actually adduced before the commission and the district court,* the maximum rates established by the commission are unlawful and unreasonable and constitute a taking of the property without due process of law in violation of Minn. Const. art. 1, § 7, and U. S. Const. Amend. XIV. If such rates are confiscatory, it will be unnecessary to consider the further issue of whether the commission has jurisdiction of intrastate traffic passing over the crossover tracks between the Milwaukee line and the barge terminal tracks. A minor issue pertains to the sufficiency of the notice of appeal from the order of the commission to the district court.

We are not here concerned with *interstate* traffic shipments which are unloaded directly from a river barge into a car or directly from a car to a barge, but solely with river-traffic shipments—such as cargoes of coal—which have come to rest on the docks of the barge terminal, or have there been stored, and are subsequently loaded on rail cars for *intrastate* haulage to consuming industries

located within an area designated by the commission as the St. Paul switching district (a district encompassing several points designated by the carriers as separate stations, although they are [with certain exceptions such as North St. Paul, South St. Paul, and Newport] all located within the city of St. Paul), *and of return shipments* from such industries to the barge terminal docks for storage or to industries occupying barge terminal space as tenants. At the time of the hearing, the barge terminal had two industrial tenants.

The Port Authority of the city of St. Paul, a municipal commission created in 1932 pursuant to statute (M. S. A. 458.09 to 458.19), owns and operates within the city limits a municipal barge terminal fronting on the Mississippi River. Docks and rail trackage upon the barge terminal are owned by the Port Authority. The barge terminal trackage has two separate outlets or connections with the St. Paul switching district. One of these is with and through the Hoffman avenue yard of the St. Paul Bridge & Terminal Railway Company (hereinafter called Bridge & Terminal), which is engaged solely in switching operations. Bridge & Terminal since 1941 has been owned and separately operated by defendant Chicago, Great Western Railway Company (hereinafter called Great Western). Between 1934 and 1941, the Bridge & Terminal system was operated by Great Western under a lease. Prior to 1934, Bridge & Terminal was a separate and independent unit.

The other outlet is over a 158.2-foot track which connects the barge terminal trackage with the line of respondent Chicago, Milwaukee, St. Paul & Pacific Railway Company (hereinafter called Milwaukee). This short piece of track, owned by Milwaukee and located on its property, was originally built by Milwaukee in 1931— but paid for by the city of St. Paul—in compliance with an order of the interstate commerce commission issued in accordance with 49 USCA, § 6, par. 11 (formerly par. 13), upon the complaint and request of said city.[2] For the sole purpose of convenient designation, we shall herein refer to these 158.2 feet of track as the crossover

---

[2] See, City of St. Paul v. C. M. St. P. & P. R. Co. 160 I. C. C. 227.

track, although plaintiffs contend that such a designation is a misnomer, in that it actually is nothing more than a switch track. Plaintiffs point out that it is not a main line track and does not cross the tracks of other carriers.[3] Labels of identification are not determinative of the nature of the object to which applied.

These proceedings were begun in December 1943 upon a complaint filed with the state railroad and warehouse commission by the Port Authority. A similar complaint was later filed by the attorney general of Minnesota. Both matters were joined and tried as a single proceeding. The complaints, which alleged the rates established by defendants for intrastate carload traffic from the barge terminal to industries within the so-called St. Paul switching district to be unreasonable, unequal, discriminatory, and unlawful, requested the commission to investigate and make a tariff of rates to be substituted for those of which complaint was so made.

Pursuant to the hearing, the commission made findings of fact whereby it found that the existing rates were excessive, unreasonable, and unduly preferential to certain shippers, and further found certain designated maximum charges to be reasonable. Upon these findings, the commission ordered defendants to substitute for their former tariffs the following maximum rates:

### COMMISSION RATE SCHEDULE

(1) $4.40 per car on either the Milwaukee line or the Great Western for the movement from the barge terminal to a connection with a connecting line.

(2) $4.40 per car for the movement from points on the barge terminal to industries on the tracks of the so-called South St. Paul terminal (also known as the Bridge & Terminal) of the Great Western.

(3) $7.87 per car for the movement from points on the barge terminal to industries on the tracks of the Great Western ($4.40 plus a switching charge of $3.47).

---

[3] See, City of St. Paul v. C. B. & Q. R. Co. 168 I. C. C. 379; City of St. Paul v. C. M. St. P. & P. R. Co. 160 I. C. C. 227.

(4) $7.87 per car between points on the barge terminal and industries on the tracks of any of the following:

(a) Chicago, Burlington & Quincy Railroad Company;

(b) The Milwaukee line;

(c) Chicago, St. Paul, Minneapolis & Omaha Railroad Company;

(d) Chicago, Rock Island & Pacific Railroad Company;

(e) Great Northern Railway Company;

(f) Northern Pacific Railway Company ($4.40 for the movement from the barge terminal to a connecting line plus one switching charge of $3.47 for the switching road).

(5) $11.34 per car from points on the barge terminal to industries on the tracks of the Soo Line or on the tracks of the Minneapolis & St. Louis Railroad Company ($4.40 for the movement to the connecting line plus two switching charges of $3.47 each for two switching lines).

(6) $11.33 per car from points on the barge terminal to industries on the tracks of the Minnesota Transfer Railway ($4.40 plus a Minnesota Transfer switching charge of $6.93).

After service of the commission's order upon them, defendants appealed to the district court from the order and moved the court for an order staying the commission's order pending the appeal. Upon appeal to this court from the district court's order granting defendants' motion, we affirmed such order. See, State and Port Authority of St. Paul v. N. P. Ry. Co. 221 Minn. 400, 22 N. W. (2d) 569.

The district court, after a hearing in which certain new evidence was received and considered in addition to the evidence presented to the commission, vacated the order of the commission as unreasonable and unlawful, in that the rates thereby established were confiscatory and also on the further ground that the commission specifically had no jurisdiction to regulate rates over the 158.2-foot crossover track of Milwaukee or to compel Milwaukee to make said crossover track available for use by other roads. On July 15, 1948, an appeal to this court was taken from the judgment of the district court.

 The power to investigate and regulate railroad rates involves a legislative and administrative function which is exclusively vested by statute in the railroad and warehouse commission. §§ 216.16 and 216.19.[4] The legislative power of rate making may in no event be exercised by the district court. While that court upon appeal may take evidence *de novo* to determine if, in the light thereof, the commission's order was illegal or unreasonable at the time of its making, it cannot try the matter in controversy *de novo* and substitute its own findings for those of the commission. It is not concerned with the wisdom of the commission's order. Its appellate function embraces no power of revision, but only the judicial power of review to determine for itself, after an examination of the entire matter in controversy as to both questions of fact and law, whether the commission's findings of fact, upon which its order must be based, are reasonably supported by the evidence, and whether in the light of such factual findings its order is reasonable and lawful.[5] See, § 216.25. In the State and R. R. & W. H. Comm. case we said (209 Minn. 572, 297 N. W. 193):

"The lawfulness and reasonableness of the commission's order is to be tested by whether it kept within its jurisdiction, whether in arriving at its decision it was guided by the controlling rule of law * * * or acted capriciously and at pleasure, and whether the evidence fairly supports the findings on which its conclusions rest."

[4]See, State and R. R. & W. H. Comm. v. M. & St. L. R. Co. 209 Minn. 564, 297 N. W. 189; State v. Tri-State T. & T. Co. 204 Minn. 516, 284 N. W. 294; Western Buse Tel. Co. v. N. W. Bell Tel. Co. 188 Minn. 524, 248 N. W. 220; 9 Am. Jur., Carriers, § 89.

[5]See, Twin City Motor Bus Co. v. Rechtzigel, 229 Minn. 196, 38 N. W. (2d) 825; State v. G. N. Ry. Co. 130 Minn. 57, 153 N. W. 247, Ann. Cas. 1917B, 1201; Steenerson v. G. N. Ry. Co. 69 Minn. 353, 72 N. W. 713; State ex rel. R. R. & W. H. Comm. v. G. N. Ry. Co. 123 Minn. 463, 144 N. W. 155; Brogger v. C. St. P. M. & O. Ry. Co. 137 Minn. 338, 163 N. W. 662; Abrahamson v. C. N. Ry. Co. 177 Minn. 136, 225 N. W. 94; M. & St. P. S. R. Co. v. Villages of Excelsior and Tonka Bay, 186 Minn. 573, 244 N. W. 61; 5 Dunnell, Dig. & Supp. § 8082.

In discharging its purely judicial function of determining whether the rates and regulations established by the commission are lawful and reasonable, the district court is governed by the statutory rule (§ 216.25) that *the commission's findings of fact shall be prima facie evidence of the matters therein stated, and that its order shall be prima facie reasonable, and the burden of proof upon all issues raised by the appeal shall be on the appellant.* (See, also, § 216.19.) Under this rule, the district court may not, in exercising its own independent judgment, make findings in utter disregard of those of the commission. In the first place, the findings of fact by the commission are in themselves prima facie evidence of the matters therein stated, and such matters so found must be accepted by the district court as established until their prima facie foundation, in the light of the evidence as a whole, is swept away by *clear and convincing evidence to the contrary.* The presumption of reasonableness attached by § 216.25 to the findings and the order of the commission is not to be treated lightly and confused with the ordinary statutory presumption which usually may be rebutted with slight evidence. 9 Am. Jur., Carriers, § 90. The rule of review by the district court is the same as that of an appellate court in reviewing the findings of a jury.[6] State and R. R. & W. H. Comm. v. M. & St. L. R. Co. 209 Minn. 564, 297 N. W. 189; Abrahamson v. C. N. Ry. Co. 177 Minn. 136, 225 N. W. 94. The constitutional right to due process of law through an independent judicial review—pursuant to which the reviewing court, after affording the parties an opportunity to present such additional evidence as may be material, determines for itself whether the commission's order is lawful and reasonable and whether it is reasonably supported by the evidence at the time of its making—is not impaired by an application of the rule that the statutory presumption of reasonableness, after a full hearing

---

[6]In Steenerson v. G. N. Ry. Co. 69 Minn. 353, 410, 72 N. W. 713, 729, Mr. Justice Mitchell, in a concurring opinion, said:

" * * * it is only when a rate is manifestly so grossly inadequate that it could not have been fixed in the exercise of an honest and intelligent judgment that the courts have any right to declare it to be confiscatory."

by the commission, may be rebutted only by clear and convincing evidence. In State v. Tri-State T. & T. Co. 204 Minn. 516, 526, 530, 284 N. W. 294, 302, 304—after observing that in complex and delicate cases much weight attaches to the commission's judgment—we quoted with approval the language of Mr. Chief Justice Hughes in St. Joseph Stock Yards Co. v. United States, 298 U. S. 38, 53, 56 S. Ct. 720, 726, 80 L. ed. 1033, 1042, wherein he said:

"But this judicial duty to exercise an independent judgment does not require or justify disregard of the weight which may properly attach to findings upon hearing and evidence. * * * *Judicial judgment may be none the less appropriately independent because informed and aided by the sifting procedure of an expert legislative agency.* * * * We have said that 'in a question of ratemaking there is a strong presumption in favor of the conclusions reached by an experienced administrative body *after a full hearing.'* * * * The established principle which guides the court in the exercise of its judgment on the entire case is that *the complaining party carries the burden of making a convincing showing and that the court will not interfere with the exercise of the rate-making power unless confiscation is clearly established.*" (Italics supplied.)

▇▇▇▇ In proceedings pursuant to § 216.25 for a review by the district court to determine whether an order of the railroad and warehouse commission is lawful and reasonable in a rate-making case, an appeal therein from a judgment of the district court, vacating such order of the commission as unlawful, unreasonable, and confiscatory, presents to the supreme court the sole issue of whether all the evidence, inclusive of the evidence submitted to the district court as well as that presented to the commission, sustains the district court's finding that the order of the commission is unlawful and unreasonable. As to findings of fact, the supreme court merely determines whether the district court, in the light of all the evidence before it and before the commission, applied to the findings and order of the commission the same rule of review which governs an appellate court in reviewing the findings of a jury.

In determining whether the district court erred in vacating the commission's order as unreasonable and unlawful, in that the rates established were confiscatory, we turn to the evidence as a whole. After first recognizing that a current field study of costs could not be made because of war conditions, the commission by its findings rejected as distorted and as not portraying conditions or costs of operation at St. Paul or elsewhere a prior field study made by Glen F. Vivian, a witness for defendants. Vivian's field study of St. Paul switching operations, based on the so-called Saur-Coverston formula, had been made for defendants in 1933 (with the exception of a field study for the Bridge & Terminal of Great Western in 1937). This field study was factored or adjusted by Vivian to the year 1944 to reflect changes in wage, material, and other costs. The field study so factored was then applied to an interstate traffic volume of 1,154 cars which in 1940 passed, with respect to the Federal Barge Line, between the Port Authority and the industries in the St. Paul switching area. Such *interstate* traffic volume was, according to Vivian, selected because no *intrastate* traffic volume was available to which the results of the study could be applied, and for the further reason that the year 1940 came nearest to being a normal year not distorted by wartime conditions. After refusing to give any consideration to the result of Vivian's study, the commission, in indicating the basis for its findings and order, said:

"The Commission must therefore be guided by a comparison with existing rates and charges on like services or what has been found reasonable by this and other regulatory agencies in the past."

As a basis for its findings, the commission then turned to cases wherein the interstate commerce commission (herein called I. C. C.) had theretofore established certain rates as reasonable for similar services. These I. C. C. cases involved Des Moines, Iowa, and certain rate-fixing decisions in the St. Paul switching district. We shall first consider the Des Moines Union Switching case (Des Moines Union Ry. Switching, 231 I. C. C. 631), wherein certain switching services are similar to those of the instant case with respect to

switching movements from points on the barge terminal to a connection with a connecting line either over Milwaukee or Great Western (see commission's rate schedule, *supra*). An examination of the Des Moines decision reveals that I. C. C. analyzed and determined the charges necessary for each type of switching service to cover the cost of the service plus a reasonable return on the investment. (231 I. C. C. 670.) Included in the analysis are certain *intermediate* switching services which are not analogous to any of the switching operations for which the commission herein ordered a rate of $4.40. *Intermediate* switching pertains to switching performed by a carrier *which neither originates nor terminates the shipment* and which consequently is not burdened with the extra work and expense incurred by an originating and terminating carrier by way of shipment classification and in the delivery, return, and spotting of empty cars. (See, 231 I. C. C. 670, and footnotes on pp. 631, 632.) The I. C. C. figures for Des Moines clearly demonstrate the materially lower cost of *intermediate* switching. Obviously, we must confine ourselves to the services at Des Moines, which are comparable to those of the instant case, namely, to connection terminal, intraterminal, and interterminal switching. For these analogous services at Des Moines, I. C. C. established rates of $4.85, $6.50, $7.20, and $7.40, which, as applied to the total number of cars moved at these various rates, gives us an average rate of $5.78 as compared to the lower rate of $4.40 ordered by the commission in the instant case. Although it may be contended that an average of the costs based on only a part of the movements within a switching unit is not wholly accurate, it does come substantially nearer to the actual cost than an average which is distorted from an inclusion of services which are wholly dissimilar. The commission also failed to take into consideration that the costs at Des Moines were computed for the year 1936 and that they were not factored to reflect the change in price levels for 1944. The Des Moines yardstick not only fails to sustain the commission's $4.40 rate, but, with respect to the services which are analogous, demonstrates such rate to be unreasonable and inadequate. In this respect,

the district court found correctly when it held that the Des Moines Union switching costs are not comparable to switching costs in the instant case and that the switching movements are not the same, with certain exceptions already noted.

Aside from the I. C. C. cost and reasonable return analysis at Des Moines, the commission based its $4.40 maximum charge directly upon the present *interstate* maximum rate for switching movements from the St. Paul barge terminal to connections with connecting lines or industries on the Bridge & Terminal tracks. I. C. C. in 1929 (Switching at St. Paul, 159 I. C. C. 189, docket No. 3285) ordered a maximum interstate rate of $4, which in 1938 (Fifteen Percent Case, Ex parte No. 123, 226 I. C. C. 41) was increased by ten percent to $4.40. On their face, the *interstate* and the commission's *intrastate* switching rates are identical, but when the material element of per diem is taken into consideration we have a substantial difference.[7] In 1929, when the $4 *interstate* rate was ordered by I. C. C., Bridge & Terminal was an independent switching carrier which was not owned or controlled by any other carrier. When the interstate rate was originally established (docket No. 3285), Bridge & Terminal did not own any rolling equipment except locomotives, and it did not pay any hire (per diem) on stock cars of other carriers. (Switching at St. Paul, 159 I. C. C. 189, 192, docket No. 3285.) Since July 1934, when the Bridge & Terminal system was leased to Great Western for operation (followed by a purchase of the system in 1941), Great Western, pursuant to I. C. C. regulations, has been required to pay per diem in behalf of Bridge & Terminal for the use of the cars of other carriers. This change in situation was at once recognized in 1934 by the Federal Barge Line—an interstate line-haul carrier—which then agreed to pay a per diem reclaim to the Bridge & Terminal unit of Great Western.

---

[7] Railroads pay per diem and per diem reclaims for the use of cars which they do not own. When the Federal Barge Line pays per diem to a railroad company, it goes to the benefit of the carrier which owns the car. When the Federal Barge Line pays per diem reclaims, it goes to a railroad company other than the owner as a reimbursement for per diem charges paid by such nonowning carrier to the actual car owner.

Taking the view of the evidence most favorable to the commission's order, the average per diem reclaim *paid to Bridge & Terminal* on cars switched for the Federal Barge Line over Bridge & Terminal in 1940 amounted to $1.87 per car. There was testimony to show that the total average per diem reclaim paid *to all carriers* in 1940 by the Federal Barge Line was $3.05. In the instant case, the commission, *after refusing to give any consideration to per diem and per diem reclaim testimony,* established a flat rate of $4.40. There is no evidentiary basis for an assumption that the loss of per diem reclaims is offset by demurrage charges. As a result, if the commission rate were to go into effect, Bridge & Terminal, on an *intrastate* car movement, would receive $4.40, *minus* an average per diem car charge of $1.87, or only $2.53, whereas on an identical *interstate* car movement the same carrier would receive the full $4.40, because its per diem charges would be offset by a per diem reclaim from the line-haul carrier. The same situation prevails with respect to the crossover track owned by Milwaukee. Here, the commission used only a part of the interstate yardstick in determining a reasonable intrastate rate. When the entire yardstick—inclusive of per diem and per diem reclaims—is applied, it becomes clear that the *intrastate* rate fixed by the commission is unreasonable and wholly inadequate.

It is to be noted that the $4.40 rate, which *upon the evidence as a whole* is manifestly so inadequate as to be confiscatory and unlawful, is a basic element of all the maximum rate charges ordered by the commission. (See, commission rate schedule, *supra.*) In addition to this basic rate of $4.40, we have the item of switching costs for which defendants were allowed a maximum rate of $3.47. (See, items 3, 4, and 5 of commission's rate schedule, *supra.*) Again, the commission turned to I. C. C. for guidance by adopting as a reasonable charge the *reciprocal* switching rate for certain similar interstate movements in the St. Paul area. These *reciprocal* interstate switching rates vary according to the switching distance traveled, and in the St. Paul switching district generally range from $1.98 to $3.96 per car. The commission took one of these reciprocal switch-

ing charges, namely, $3.47 per car, as a guide, but utterly failed to take into consideration that such *reciprocal interstate rates* for similar services were not approved by I. C. C. on a compensatory basis, *and further that they were adopted on the condition that per diem and per diem reclaims would be paid.* A switching charge based on reciprocity, and not on a reasonable cost or compensatory basis, is intended to enable one line-haul carrier to reach industries on another carrier's line at a comparatively lower rate. The reciprocal rates are of mutual advantage to the line-haul carriers concerned. One carrier makes a switching charge concession because of reciprocal services performed, or to be performed, at other and distant places by other line-haul carriers. (U. S. War Dept. v. A. & S. Ry. Co. 77 I. C. C. 317, 360.) I. C. C. expressly recognizes that the reciprocal switching charges in the St. Paul district, as elsewhere, are usually not based on cost. (City of St. Paul v. C. B. & Q. R. Co. 192 I. C. C. 79, 85.) Reciprocal services are not involved with respect to the *intrastate* switching movements for which the commission here adopted the interstate rate of $3.47. In establishing the reciprocal rates, I. C. C. did so on the condition that all switching carriers would receive the benefits of the actual per diem and the usual per diem reclaims to be paid by the Federal Barge Line.[8] The evidence clearly shows that these per diem charges and per diem reclaims paid by the Federal Barge Line on interstate movements have been substantial. As already noted, there is testimony that the average per diem reclaims for 1940 amounted to $3.05 per car. In one of its decisions, I. C. C. pointed out that the per diem reclaims assumed by the Federal Barge Line ranged from $3.50 to $4.50 per car.

In ignoring substantial per diem and per diem reclaims, we have a similar situation with respect to the $11.33 commission rate for switching between the barge terminal and the Minnesota Transfer industries. The $11.33 rate includes the basic charge of $4.40 plus $6.93 for Minnesota Transfer switching. The $6.93 rate corresponds to an interstate charge for interstate switching movements to and

[8]See footnote 7, *supra.*

from the Hoffman yard and also to and from the Milwaukee connecting track. It was originally fixed by I. C. C. at $6.30 (City of St. Paul v. C. B. & Q. R. Co. 168 I. C. C. 379, 389, and City of St. Paul v. C. B. & Q. R. Co. 192 I. C. C. 79), but later increased by ten percent to $6.93. (Fifteen Percent Case, Ex parte No. 123, 226 I. C. C. 41.)

The commission either ignored or failed to take into consideration the fact that the I. C. C. reciprocal rate is not indicative of the reasonable cost of the switching service and is in fact not intended to be compensatory. Aside from the noncompensatory nature of reciprocal rates, it is important to note that they were adopted by I. C. C. upon the express condition that the interstate switching carrier should receive the benefit of per diem and per diem reclaims to be paid by the Federal Barge Line. This same condition was coupled with the adoption of the Minnesota Transfer switching rate of $6.93, and, as first noted, with the adoption of the basic rate of $4.40. In its use of I. C. C. *interstate* rates as a guide for establishing reasonable and lawful *intrastate* rates for similar services, *without taking into consideration and making a proper allowance for the per diem and other cost factors which entered materially into the formulation of the interstate rates,* the commission, in the light of the evidence as a whole, not only failed to adopt a reasonable and lawful basis for its findings and order, but supplied defendants with the clear and convincing evidence to the contrary which is necessary to sweep away the prima facie foundation of reasonableness which attaches to orders of the commission under § 216.25.

In view of the evidentiary basis expressly used by the commission to sustain its findings and order—a basis consisting of evidentiary factors which when considered in their entirety convincingly demonstrate the inadequacy and unreasonableness of the rates prescribed— it is unnecessary to give any appreciable weight or consideration to the study made by Vivian, defendants' cost expert. It is interesting to note, however, that Vivian testified that on movements between the Port Authority and industries on the Omaha the average switching cost was $34.18 per car; industries on the Great Northern,

$30.91 per car; industries on the Northern Pacific, $27.34 per car; industries on the Milwaukee, involving switching originating and terminating on that road, $19.71 per car; industries on the M. & St. L., $26.43 per car; industries in the Fordson district on the Milwaukee, $17.67 per car; Minnesota Transfer industries, $22.85 per car; industries, or to connections with other lines, on the Bridge & Terminal of Great Western as a separate unit (which as an item is included in the previously enumerated costs except those of Milwaukee), $10.84 per car. R. L. Bitney, a rate expert for the commission, expressed the opinion that Vivian's cost study was not sound, because it was primarily based upon a traffic year (1933) that was not typical, in that it was second lowest in traffic volume in Minnesota for a period of 22 years, and further in that the study did not take into consideration the cost of all switching operations in the St. Paul switching district. It is significant, if we assume Bitney's criticism to be true and make allowance therefor to the very material extent of reducing Vivian's cost figures by one-half, that we still have a reasonable cost average in excess of the rates allowed by the commission.

We also have an exhibit giving the result of a terminal cost study made by Bitney himself in 1927 with the aid of the Saur-Coverston formula. This study, which was presented before I. C. C. in the Western Trunk Line Class Rates (164 I. C. C. 1, at 96, docket No. 17000, part 2), was introduced by the state and testified to by Bitney. *It was not localized with particular reference to the costs at the St. Paul terminal,* but represented the average terminal costs of the hereinafter named railroads for all terminals in Minnesota. Bitney's study, which had not been factored to reflect changes in price levels from 1927 to 1944, showed that for switching movements said to be similar to those involved in the instant case the costs were: For the Omaha, $15.75; the Great Northern, $13.86; the Soo at the St. Paul terminal only, $7.94; the Soo at all terminals, $9; the Northern Pacific at the St. Paul terminal only, $8; the Northern Pacific at all terminals, $7; the Milwaukee, $12.68; the Great Western, $18.32; the Burlington, $11.32; the Northwestern, $12.14; and

the M. & St. L., $8.23. Bitney testified that the above study under the Saur-Coverston formula, which included the nine railroads involved in these proceedings, gives cost figures which *in his opinion* unnecessarily make an allowance for a reasonable return on the investment.

Because the evidence as a whole sustains the district court's findings that the commission's order is unreasonable and unlawful, as constituting a taking of property without due process of law, the commission's order (pursuant to § 216.25) stands vacated, and it becomes unnecessary to consider the further issue as to the jurisdiction over intrastate traffic passing on the crossover track between the barge terminal and the Milwaukee line.[9]

10. Plaintiffs contend that the appeal of defendants to the district court was not from the *whole order* of the commission, but only from such parts thereof as were specified in their notice of appeal, and that therefore the commission's determination of the propriety of the establishment of the St. Paul switching district and its finding of the illegal and discriminatory practices by the carriers must stand. We find it unnecessary to determine the scope of the notice of appeal. It was sufficient in any event to present to the district court the issue of whether the commission's order established rates that were unreasonable and unlawful, and the district court, having found the rate so ordered to be unreasonable and unlawful, was required under § 216.25 to vacate and set aside the order in its entirety. The district court, in reviewing an appeal from an order of the commission, has no power of revision, but only

---

[9]In re jurisdiction: Cf. 49 USCA, § 1, par. 2, and 49 USCA, § 6, par. 11. See, Cleveland, C. C. & St. L. Ry. Co. v. United States, 275 U. S. 404, 48 S. Ct. 189, 72 L. ed. 338; People ex rel. New York Cent. R. Co. v. Public Service Comm. 198 App. Div. 436, 191 N. Y. S. 636, affirmed without opinion, 232 N. Y. 606, 134 N. E. 590, certiorari denied, 258 U. S. 621, 42 S. Ct. 314, 66 L. ed. 795; United States v. New York Cent. R. Co. 272 U. S. 457, 47 S. Ct. 130, 71 L. ed. 350; People ex rel. New York Cent. R. Co. v. Public Service Comm. 195 App. Div. 426, 187 N. Y. S. 24; Citizens of Pipestone v. C. M. & St. P. Ry. Co. 167 Minn. 174, 213 N. W. 534; City of St. Paul v. C. B. & Q. R. Co. 168 I. C. C. 379.

the judicial power to affirm or vacate the order according to whether or not it finds the order either to be reasonable and lawful or unreasonable and unlawful. If the court were to exercise the power of vacating only a portion of the order, it would thereby, through a process of indirection, exercise the legislative prerogative of revision. The power of revision cannot be conferred on the court by means of limitations incorporated in the notice of appeal. If the notice of appeal presents to the district court a material issue upon which the commission's findings and order are found to be unreasonable or unlawful, the entire order of the commission must be vacated and set aside; and, likewise, if upon such material issue the findings and order are found to be reasonable and lawful, the entire order must be affirmed.

The judgment of the district court is affirmed.

Affirmed.

PETERSON, JUSTICE (dissenting).

I think that there was no credible or competent evidence of confiscation.

1. The finding of confiscation was based exclusively upon the testimony of Glen F. Vivian. There was no evidence of valuation, cost, expense of operation and maintenance, or other factors entering into the fixing of a rate.

Vivian's testimony should be rejected as a matter of law because of the absence here of the factors which he says are requisite to give it validity. He used the so-called Saur-Coverston formula. According to his testimony, the formula is a means for computing a rate by applying cost, maintenance, expense, and other factors entering into a rate to the facts of a particular case, which can be determined only by "field" tests; that such tests can be made only by first determining costs of service and engine production of the particular carrier for the particular service by tests of at least a week's duration; that after that had been done it is "necessary" that the costs be applied to *actual movements* of traffic; and that without such tests there was no way of knowing what a particular rate

should be. Here, there were no actual movements of traffic to which the formula could be applied. The rates fixed were, therefore, to be prospective in operation. Mr. Vivian testified:

"Now that the costs and engine production had been found, it was necessary that there be some actual movements of traffic to which the costs could be applied. Investigation showed that there had been practically no movement of traffic between industries in St. Paul and the Port Authority of St. Paul. *In other words, the carriers were faced with a complaint as to switching rates with respect to traffic which did not exist.* Accordingly, in an effort to present to the Minnesota Railroad and Warehouse Commission data which might be of assistance to them in arriving at their decision, an effort was made to find actual movements of traffic which would most nearly represent the service required in Port Authority movements, *if they had existed."* (Italics supplied.)

To supply this obvious lack of any basis for his testimony, Mr. Vivian said that he made a study of rates for comparable services by railroads in switching for the Federal Barge Line, which he characterized as almost "identical" with those here involved. That assertion was false as a matter of law, for the obvious reason that, while according to his testimony there were actual traffic movements to the Federal Barge Line, there were none to the Port Authority.

That being true, there was absolutely no factual basis for the application of the formula, and consequently there was no basis for a finding of confiscation.

2. While I do not deem it necessary to consider the matter of the per diem charge for the use of cars, I think the matter is entirely immaterial here. Per diem charges are made by carriers against each other and not by carriers against shippers. Demurrage charges are made by carriers against shippers to cover delays in unloading cars. No claim was made here that demurrage charges permitted by our statute are not adequate.

3. Where evidence based upon actual experience has not demonstrated a rate to be confiscatory, the court should not set it aside. As said in New York v. United States, 331 U. S. 284, 340, 67 S. Ct. 1207, 1236, 91 L. ed. 1492, 1532:

"Where the result of a rate order is not clearly shown to be confiscatory but its precise effect must await operations under it, the Court has refused to set it aside despite grave doubts as to its consequences."

The commission in the exercise of its rate-making function adopted rates fixed by the interstate commerce commission for comparable services. These rates were but a fraction of those which the carriers contended should be established. The rates established by the interstate commerce commission are at least fair, reasonable, and compensatory. They are clothed with every presumption of validity.

There can be no doubt from what was said by the carriers upon the argument here that they do not want to render the switching services in question if they can avoid doing so.

Under the circumstances, we should be guided by the rule of the New York case, *supra*. When it appears from actual experience that the rates fixed are confiscatory, it will be time enough to set them aside.