STATE v. DULUTH, MISSABE & IRON RANGE RAILWAY COMPANY.
ORDER OF RAILWAY CONDUCTORS AND OTHERS, INTERVENORS.[1,2]

February 24, 1956.

No. 36,621.

[1]Reported in 75 N. W. (2d) 398.
[2]Certified to United States Supreme Court May 22, 1956.

*Donald D. Harries, Franklin B. Stevens,* and *William H. Crago,* for appellant.

*Miles Lord,* Attorney General, and *Victor J. Michaelson,* Assistant Attorney General, for the State.

*Gordon Rosenmeier* and *Fred A. Cina,* for intervenors.

KNUTSON, JUSTICE.

This is an appeal from a judgment affirming an order of the Railroad and Warehouse Commission requiring the reestablishment of railroad passenger service on defendant's lines hereinafter described.

For the sake of brevity, we shall include only those facts deemed essential to an understanding of the issues to be determined.

Defendant Duluth, Missabe and Iron Range Railway Company, referred to hereinafter as the railway company, is a railway corporation, organized under the laws of Minnesota, engaged in operating as a common carrier of passengers and freight. It operates principally between the city of Duluth and the villages and towns on the Iron Range in this state. Several years ago it operated several passenger trains between the cities and villages connected by its tracks, but most of these were abandoned long ago. At the time of the commencement of these proceedings it operated a passenger train, designated as No. 1, which left Duluth at 8:20 a. m. and arrived at Hibbing at 11:38 a. m. With this service, it furnished bus service between some of the smaller towns. Its train No. 2, going in the opposite direction, left Hibbing at 1:15 p. m. and arrived at Duluth at 4:10 p. m. Train No. 11 connected with train No. 1 at Iron Junction and ran from that point to Virginia. It left Iron Junction at 10:46 a. m. and arrived at Virginia at 11:22 a. m. Train No. 12 left Virginia at 9:45 a. m. and arrived at Iron Junction at 10:20, connecting with train No. 1 at that point; and train No. 14 left Virginia at 1:10 p. m. and arrived at Iron Junction at 1:56 p. m. so as to connect with train No. 2. Trains Nos. 1 and 2 stopped at the following intermediate stations between Duluth and Virginia-Hibbing-Buhl: Missabe Junction (Duluth), 57th Avenue West (Duluth), Proctor, Adolph, Saginaw, Grand Lake, Burnett, Culver, Alborn, Payne, Kelsey, Zim, Forbes, Iron Junction, Wolf, Wilpen, Mitchell, Shenango, and Chisholm and would stop on flag at Munger, Birch, Sax, Fens, Macon, and Sherwood. Trains Nos. 11, 12, and 14, between Virginia and Iron Junction, stopped at the intermediate stations of Eveleth and Largo and by flag at Spruce and Rainy Junction.

The distance from Duluth to Hibbing is 84 miles; from Duluth to Buhl 90 miles; and from Duluth to Virginia 78 miles.

The schedule of trains Nos. 1 and 2 was so arranged as to connect with trains coming into Duluth in the morning from Chicago, the Twin Cities, and other points to the east, south, and west and, similarly, in the evening with trains leaving Duluth for other points. All the trains carried mail and express.

The total population served by these trains is somewhat in excess of 150,000, of which approximately 107,000 live in the Duluth-Proctor area; 42,000 in the five major Range villages; and slightly in excess of 1,000 in the vicinity of the other intermediate stations named above.

Each train was manned by a full crew of five members.

Daily air service is available between Duluth, Hibbing, and Chisholm, and, except Sunday, other daily passenger train service is available between Duluth and Virginia. No passenger service, aside from that involved here, is available between Duluth and Hibbing or other towns served on that part of the line.

The railway company's track and track bed are among the best to be found anywhere. Its principal business is that of transporting iron ore from the Iron Range to the docks in Duluth and Superior. Its freight equipment has been improved and modernized so as to raise its efficiency to the highest possible level. Its passenger service, on the other hand, is rendered by an old-type steam locomotive. Its cars, while probably adequate for the limited use made of them, have not been modernized. Its time of operation has not been improved for many years.

At the time of trial, the net investment of the railway company after deducting depreciation and amortization, plus materials, supplies, and cash, was $101,753,864. The net operating income of the entire system for 1952 was $5,638,186 and for 1953 it was $10,405,444. In the operation of the passenger service here involved it suffered an "out-of-pocket" loss in 1951 of $195,753.03 and for 1952 of $223,127.36. The railway company contends that there are other expenses common to both freight and passenger service, part of which properly is assignable to passenger service, which are not included in the above

figures and that, if they had been included, the loss would have been even greater.

Over the years the number of passengers carried on the trains involved has decreased substantially. For the year 1952 the average number of passengers carried per train mile was 4.62 or slightly less than the five-man crew. The total number of passengers carried and revenue derived from them for the years covered by the evidence are as follows:

| Year | Passengers Carried | Revenue Received |
| --- | --- | --- |
| 1950 | 12,066 | $8,151.87 |
| 1951 | 12,438 | 7,334.20 |
| 1952 | 13,854 | 7,806.98 |
| 3 months of 1953 | 2,431 | 1,403.05 |

In addition to the above, revenue was derived from mail and express transportation so that the total revenue for 1952 amounted to $75,193.15.

The larger villages involved in the service are served by a number of buses running each way each day and also by some air service. Some of the smaller towns are located from a short distance up to four or five miles from highways on which buses run. The number of people so situated that bus service would not be directly available would probably be slightly more than 1,000. Some of the roads on which buses run or might run are affected by climatic conditions so that in the spring of the year it is not possible for buses to run on them. Since the abandonment of rail passenger service, star routes have been established to carry mail to the Range towns and from those towns to Duluth, and it is somewhat doubtful from the evidence in this case whether contracts for the carrying of mail could be recaptured.

On March 5, 1952, the railway company filed its application with the Railroad and Warehouse Commission for authority to discontinue the above passenger service. Public hearings were held at Hibbing and Duluth. The Railroad and Warehouse Commission then consisted of Commissioners Ewald W. Lund, Elling A. Knutson,

and Clifford C. Peterson.[3] On November 7, 1952, after quite a lengthy hearing, the commission made its order authorizing discontinuance of the service. Commissioner Peterson dissented.

Thereafter an application was filed by the Range Municipalities and Civic Association for a rehearing. In the meantime the personnel of the commission had changed by the election, at the November 1952 general election, of Paul A. Rasmussen in the place of Commissioner Knutson. The commission set the application for hearing on December 11, 1952. The commission failed to act on the application, and, no appeal having been taken, the order of November 7 became final as provided by M. S. A. 216.25. Pursuant thereto, passenger service was discontinued on May 15, 1953, and, under stays granted by the district court, no service has been rendered since that time.

On April 15, 1953, the commission, on its own initiative, issued an order to show cause why the service abandoned under the order of November 7, 1952, should not be reestablished. Hearing thereon was set for May 1, 1953, at Hibbing, and the commission, with Commissioner Lund dissenting, issued an ex parte order on May 6 requiring the reestablishment of the service abandoned. No change in schedule from the former service was provided in that order. The enforcement of the order was enjoined by the district court on the ground that the commission lacked authority to make it. The hearing on the order to show cause proceeded to completion on May 21. On October 6, 1953, the commission issued its order, Lund again dissenting, which, as far as material here, reads as follows:

"That the Duluth, Missabe and Iron Range Railway Company be and it is hereby ordered to re-establish passenger train service afforded to the public prior to May 15, 1953, by the restoration of the operation of Passenger Trains Nos. 1, 2, 11, 12, 14 and bus service contributory to Train Nos. 1 and 2 between Wilpen and Buhl, Minnesota.

[3]Commissioner Clifford C. Peterson was replaced by Hjalmar Petersen in the 1954 general election. Reference to Commissioner Peterson herein has nothing to do with Hjalmar Petersen.

"It Is Further Ordered that the Respondent place in effect the following time schedule:

"That one passenger train leave Hibbing, Minnesota not later than 7:30 a. m.

"That one passenger train leave Duluth not earlier than 5:30 p. m.

"It Is Further Ordered that the time schedule of Passenger Trains Nos. 11, 12 and 14 and bus service contributory to Nos. 1 and 2 between Wilpen and Buhl, Minnesota, be co-ordinated with the schedule of Trains Nos. 1 and 2.

"It Is Further Ordered that the Respondent reduce the running time of said trains so that the total time consumed in the operation of said trains between Duluth and Hibbing be not more than two hours and fifteen minutes.

"It Is Further Ordered that said passenger train service be re-established not later than November 1, 1953."

An appeal was taken from this order to the district court, where additional evidence was received, after which the district court affirmed the order of the commission. This appeal followed.

While the railway company lists a number of assignments of error, the appeal involves essentially the questions of whether or not the order of the Railroad and Warehouse Commission is lawful and reasonable as those terms are legally defined in our statutory and case law.

■ The statute under which this appeal is taken, as construed by the court, governs the scope of this appeal. A brief history of the development of this statute may be of some help in determining the scope of our appeal. The original statute creating the Railroad and Warehouse Commission (L. 1887, c. 10) provided a very limited right of appeal. With respect to the establishment of rates, for instance, we held in State ex rel. R. & W. Comm. v. Chicago, M. & St. P. Ry. Co. 38 Minn. 281, 37 N. W. 782, that the rates fixed by the Railroad and Warehouse Commission were conclusive on the question of reasonableness. That case was removed to the United States Supreme Court on a writ of error. Chicago, M. & St. P. Ry. Co. v. Minnesota, 134 U. S. 418, 10 S. Ct. 462, 702, 33 L. ed. 970. That court reversed

our decision, holding that the question of reasonableness was a judicial question. The following language of the court is of interest here (134 U. S. 458, 10 S. Ct. 467, 33 L. ed. 981):

"* * * The question of the reasonableness of a rate of charge for transportation by a railroad company, involving as it does the element of reasonableness both as regards the company and as regards the public, is eminently a question for judicial investigation, requiring due process of law for its determination. If the company is deprived of the power of charging reasonable rates for the use of its property, and such deprivation takes place in the absence of an investigation by judicial machinery, it is deprived of the lawful use of its property, and thus, in substance and effect, of the property itself, without due process of law and in violation of the Constitution of the United States; and in so far as it is thus deprived, while other persons are permitted to receive reasonable profits upon their invested capital, the company is deprived of the equal protection of the laws."

What the court said about rates is equally true of the requirement that a railway company continue to operate a train under the circumstances involved here.

Thereafter our statute was amended by L. 1891, c. 106. Under § 3 of that act the right of appeal was considerably extended. The authority of the court on appeal is contained in the following language:

"* * * Upon such appeal, and upon the hearing of any application by the commission or by the attorney general, for the enforcement of any such order made by the commission, the district court shall have jurisdiction to, and it shall, examine the whole matter in controversy, including matters of fact as well as questions of law, and to *affirm, modify or reverse* such order in whole or in part, as justice may require; and in case of any order being modified, as aforesaid, such modified order shall, for all the purposes contemplated by this act, stand in place of the original order so modified and have the same force and effect throughout the state as the orders of said commission." (Italics supplied.)

We considered that provision in Steenerson v. G. N. Ry. Co. 69 Minn. 353, 375, 72 N. W. 713, 716, where we said after quoting the above provision:

"If by this the legislature intended to provide that the court should put itself in the place of the commission, try the matter de novo, and determine what are reasonable rates, without regard to the findings of the commission, such intent cannot be carried out, as a statute which so provided would be unconstitutional. The fixing of rates is a legislative or administrative act, not a judicial one. * * *

"* * * Under the constitution, the district court may, on appeal to it, review the findings of the commission in the same manner as an appellate court reviews the findings of the jury on a trial in the court below. And for this purpose the court may 'examine the whole matter in controversy, including matters of fact, as well as questions of law.'

"In other words, the court may examine matters of fact to *ascertain whether there is any evidence reasonably tending to support the findings of fact disputed,* and may examine questions of law arising on the facts conceded. It seems to us that this is, then, the proper interpretation of this somewhat vague and obscure statute, and the only interpretation which will render it constitutional. While the district court takes the evidence de novo, it cannot put itself in the place of the commission, and try the facts in controversy de novo." (Italics supplied.)

This provision again was amended by L. 1895, c. 107. That amendment is not of consequence here. In R. L. 1905, § 1972, the language is even broader. It provides:

"* * * The court shall try the case de novo, and render such order therein as may be just and proper, which shall stand in place of the original order."

The language of our present statute (M. S. A. 216.25) was adopted by L. 1907, c. 167. With respect to the function of the court on appeal, it reads:

"* * * Such findings of fact [of the commission] shall be prima facie evidence of the matters therein stated, and the order shall be prima facie reasonable, and the burden of proof upon all issues raised by the appeal shall be on the appellant. If the court shall determine that the order appealed from is lawful and reasonable, it shall be affirmed and the order enforced as provided by law. If it shall be determined that the order is unlawful or unreasonable, it shall be vacated and set aside."

Under this statute it would seem that the function of the court is twofold: (1) to determine if the order is reasonable; and (2) to determine if the order is lawful. If the negative of either is found, the order must be set aside. The determination of each involves separate consideration, although in many instances the elements of one overlap a determination of the other. In essence, determination of lawfulness involves mainly questions of jurisdiction, procedure, and due process. Determination of reasonableness may involve a multitude of factors, depending on the nature of each case. For instance, it involves such things as a comparative expense and possible loss to the company balanced against the convenience and necessity to the public; possibility of confiscation of property; use or lack of use of the facility by the public; availability of competing services; and many other factors depending on the facts of each case. The question which frequently is troublesome is: How far can a court go in setting aside the order of the commission on the ground of unreasonableness? The formulation of rules governing the determination of this question often has been perplexing to the court, but we believe that the applicable law now has been settled in this state as far as it can be settled.

In State v. G. N. Ry. Co. 130 Minn. 57, 59, 153 N. W. 247, 248, Ann. Cas. 1917B, 1201, 1202, the applicable law, followed in many restatements of the law,[4] was stated as follows:

---

[4]State and R. & W. Comm. v. Minneapolis & St. L. R. Co. 209 Minn. 564, 297 N. W. 189; Arrowhead Bus Service, Inc. v. Black & White D. C. Co. Inc. 226 Minn. 327, 32 N. W. (2d) 590; Twin City Motor Bus Co. v. Rechtzigel, 229 Minn. 196, 38 N. W. (2d) 825; State and Port Authority of St. Paul v.

"The principles on which the court acts in determining whether or not an order of the commission is reasonable, have been the subject of much controversy, but the law on that subject is now pretty well settled. The legislature never intended that the court should put itself in the place of the commission, try the matter anew as an administrative body, substituting its findings for those of the commission. A statute which so provided would be unconstitutional as a delegation to the judiciary of nonjudicial powers. * * * The making of regulations which require a carrier to afford proper transportation facilities to the public, is legislative or administrative and not judicial in its nature. * * * The courts must not usurp legislative or administrative functions by setting aside a legislative or administrative order on their own conception of its wisdom. * * * In Steenerson v. Great Northern Ry. Co. 69 Minn. 353, 375, 72 N. W. 713, 716, a rate case, this court, in construing the statute then in force, which was broader than the one now in force, held that it was the intention of the legislature that the court on appeal should 'review the findings of the commission in the same manner as the appellate court reviews the findings of the jury on a trial in the court below. And for this purpose the court may "examine the whole matter in controversy, including matters of fact, as well as questions of law," ' but that the district court can review the findings of the commission only so far as to determine whether or not the rates fixed by the commission are reasonable. This presents a situation somewhat anomalous in that the court may receive evidence in order to determine whether findings of fact are sustainable, but we can conceive of no other fair construction of this statute that will at the same time confine the court within its constitutional powers. The court, on appeal from the order of the commission, must distinguish, then, between the legislative power to establish regulations and the judicial power to determine upon the reasonableness of regulations already established.

N. P. Ry. Co. 229 Minn. 312, 39 N. W. (2d) 752; N. P. Ry. Co. v. Village of Rush City, 230 Minn. 144, 40 N. W. (2d) 886; see, In re Chicago, M. St. P. & P. R. Co. (D. Minn.) 50 F. (2d) 430; Rock Island Motor Transit Co. v. Murphy Motor Freight Lines (D. Minn.) 101 F. Supp. 978.

"* * * The order may be vacated as unreasonable if it is contrary to some provision of the Federal or state constitution or laws, or if it is beyond the power granted to the commission, or if it is based on some mistake of law, or if there is no evidence to support it, or if, having regard to the interest of both the public and the carrier, it is so arbitrary as to be beyond the exercise of a reasonable discretion and judgment."

We have held in a number of cases that the rule of review by the district court is the same as that of an appellate court in reviewing the findings of a jury.[5] There is, however, an obvious difference in procedure, in that, on reviewing the order of the commission, the trial court may receive new evidence not submitted to the commission, while a review in this court of the findings of a jury is limited to the record made in the trial court. As was said by Mr. Justice Hallam in State v. G. N. Ry. Co. *supra*, it does seem somewhat anomalous to hold that the order of the commission is prima facie reasonable and lawful and that, on appeal, new evidence may be received to overcome the prima facie standing of the order and that, at the same time, the trial court cannot hear the case de novo. However, it is now clear that such evidence is admitted for the limited purpose of testing the reasonableness and the lawful nature of the order.

■ The respective functions of the district court on appeal from an order of the commission and of this court on appeal from the decision of the district court are stated in Twin City Motor Bus Co. v. Rechtzigel, 229 Minn. 196, 207, 38 N. W. (2d) 825, 831, as follows:

"Respondent asserts that in the absence of a new trial this court can only consider whether the evidence supports the findings below. Respondent urges that the findings must be sustained if there is any evidence to support them. This expresses the rule on an ordinary appeal in a civil action tried in the district court. However, in view of the statutes governing appeals from the commission, a different

[5]State v. G. N. Ry. Co. 130 Minn. 57, 153 N. W. 247, Ann. Cas. 1917B, 1201; State and Port Authority of St. Paul v. N. P. Ry. Co. 229 Minn. 312, 39 N. W. (2d) 752.

rule prevails in cases of this type. The rule, as set forth in the above statute governing appeals, is that the district court's function is to determine whether the commission's order is reasonable and lawful, or whether it exceeded its jurisdiction in the light of the evidence before the commission and subsequent evidence bearing thereon received in district court.

"The rule on appeal here, therefore, is not whether the evidence reasonably sustains the district court's findings, but rather whether all of the evidence presented, including the evidence submitted to the commission and the district court as well, reasonably sustains the district court's finding that the commission's order was unlawful and unreasonable."

In State and Port Authority of St. Paul v. N. P. Ry. Co. 229 Minn. 312, 321, 39 N. W. (2d) 752, 758, we said with respect to the function of this court on such appeal:

"* * * an appeal therein from a judgment of the district court, vacating such order of the commission as unlawful, unreasonable, and confiscatory, presents to the supreme court the sole issue of whether all the evidence, inclusive of the evidence submitted to the district court as well as that presented to the commission, sustains the district court's finding that the order of the commission is unlawful and unreasonable. As to findings of fact, the supreme court merely determines whether the district court, in the light of all the evidence before it and before the commission, applied to the findings and order of the commission the same rule of review which governs an appellate court in reviewing the findings of a jury."

■ It must be kept in mind also that under our statute the burden rests on the railway company to overcome the prima facie reasonableness of the commission's order. We have held that the evidence must be clear and convincing before such order may be set aside by the court.[6] We believe that this is in accord with the great weight of authority.[7]

---

[6]See, State v. Tri-State T. & T. Co. 204 Minn. 516, 284 N. W. 294; State and Port Authority of St. Paul v. N. P. Ry. Co. 229 Minn. 312, 39 N. W. (2d) 752.

[7]See, 9 Am. Jur., Carriers, § 90.

■ Tested by these rules, it cannot be said that the evidence in this case does not sustain the findings of the commission and the trial court. The passenger service involved in this case serves a territory peculiar in itself. It consists of an area in which many people live in small towns between the larger center of Duluth and the larger villages of Hibbing, Chisholm, and Virginia. Some of the people in these smaller towns will be left without other means of transportation if the railway company's train is discontinued. While the loss to the carrier seems out of all proportion to the use made of the service, when the overall operation of the carrier is taken into consideration we cannot say that the commission went beyond its authority in ordering the reestablishment of the passenger service. Aside from the question of proper notice, which is discussed elsewhere herein, the commission does have authority to require a change in schedule of operation of the carrier's train. Schain v. G. N. Ry. Co. 137 Minn. 157, 162 N. W. 1079.

The fact that the overall operation of the carrier produces a profit does not of itself justify an order requiring maintenance of passenger service, nor does the fact that the carrier sustains a loss from the operation of the passenger service, of itself, require its abandonment. Schain v. G. N. Ry. Co. *supra.* Neither are conclusive, but both must be given consideration in determining whether public convenience and necessity require the continuance of the service.[8] Both the rights of the public and the rights of the carrier must be given consideration, and, in a large measure, the determination of the reasonableness or unreasonableness of continuing such service under the facts in each case must be left with the commission, subject to the right of review under the rules we have stated above.

■ The railway company contends that the order should be set aside because the hearing was so unfair that it deprived the railway company of due process of law. This contention is based mainly on the unfair conduct and interference of one of the commissioners, Clifford C. Peterson. We have examined the entire record and believe that it can be fairly said that no fairminded court can approve of the

[8]State v. G. N. Ry. Co. 130 Minn. 57, 153 N. W. 247, Ann. Cas. 1917B, 1201.

conduct of Commissioner Peterson. From the very beginning of the first hearing, he manifested an attitude of hostility toward the railway company. It would be useless to set forth in detail the many instances of misconduct found in the record which should be condemned by any court. A few instances should suffice for the purpose of emphasizing our disapproval.

The first hearing was commenced at Hibbing with the understanding that it later would be adjourned to Duluth. At one point in the hearing at Hibbing a question arose as to the number of people who rode on passes. The following colloquy then took place:

"Commr. Peterson: There is probably two to every cash fare riding on the train.

"Mr. Stevens: Are you aware of that fact, Mr. Peterson?

"Commr. Peterson: I heard that time and time again from other employees.

"Mr. Stevens: From whom did you hear that?

"Commr. Peterson: Is it necessary to divulge the name of every employee who talks to me about it?

"Mr. Stevens: If you are going to put evidence in in the case, I think you should be sworn and proceed according to the rules of evidence.

"Commr. Peterson: If you want to get rough about it, I will really open up down in Duluth about this employee pass situation. I will give you a workout in Duluth.

"Commr. Lund: Let's keep it under control.

"Commr. Peterson: I have got plenty of information on that."

At the commencement of the second hearing in this matter, counsel for the railway company made a number of motions for dismissal based on what he thought were legal objections to the proceedings. When he was part way through, Commissioner Peterson interrupted to say:

"Commissioner Peterson: Mr. Chairman, if Mr. Stevens doesn't want to cut out this dilly-dallying around and continue, here, I move that the people, here, or Mr. Cina, take over and we will hear the railroad company at a little later date. I also would like to say, at

this time, that our next regular business meeting, which will no doubt be Monday, Mr. Stevens, the Commission will issue an ex parte order that will move to continue these trains on for an indefinite time until the Commission has heard this complete hearing of this new proceeding.

"So I move at this time, Mr. Chairman, that if they don't want to move on this hearing that Mr. Cina take over.

"Mr. Stevens: Well, may I rise to a point of information. Do I understand that the Commission has already made up its mind in this matter?

"Commr. Peterson: We have not made up our mind. I say we will issue an ex parte order that will make this train proceed for whatever time we have deemed necessary."

Many other similar instances are to be found in the record. While the function of the Railroad and Warehouse Commission is somewhat different from a court, in that it has powers to investigate as well as to decide matters in issue, we think that it is clear that due process requires such fairness in a hearing that interested parties may have a fair opportunity to submit evidence without undue and unfair interference from those who, in the final analysis, are to judge the merits of the controversy.

In Morgan v. United States, 304 U. S. 1, 58 S. Ct. 773, 999, 82 L. ed. 1129, the United States Supreme Court had before it a case involving the validity of an order of the Secretary of Agriculture. On appeal, the case presented two questions, namely, whether the order was based on the type of hearing required by statute, and, second, whether the order was arbitrary and unsupported by substantial evidence. In holding the order invalid for lack of proper hearing, the court, speaking through Mr. Chief Justice Hughes, said (304 U. S. 14, 58 S. Ct. 775, 82 L. ed. 1130):

"The first question goes to the very foundation of the action of administrative agencies entrusted by the Congress with broad control over activities which in their detail cannot be dealt with directly by the legislature. The vast expansion of this field of administrative

regulation in response to the pressure of social needs is made possible under our system by adherence to the basic principles that the legislature shall appropriately determine the standards of administrative action and that in administrative proceedings of a quasi-judicial character the liberty and property of the citizen shall be protected by the rudimentary requirements of fair play. These demand 'a fair and open hearing,'—essential alike to the legal validity of the administrative regulation and to the maintenance of public confidence in the value and soundness of this important governmental process. Such a hearing has been described as an 'inexorable safeguard.' "

In State v. Tri-State T. & T. Co. 204 Minn. 516, 521, 284 N. W. 294, 300, we said:

"* * * Due process demands that rates be fixed only after a hearing attended by at least the rudiments of fair play."

The *rudimentary requirements* of fair play must be held to include fair treatment at the hands of the administrative officials as well as other elements of fair play.

If we were dealing with an action tried in a court of this state, we have no doubt that conduct on the part of a trial judge comparable to that of Commissioner Peterson would require a new trial and that upon such new trial the judge guilty of such misconduct should be disqualified from hearing the case again. The difficulty here is twofold. We cannot grant a new trial, nor is there any way in which we can hold that a member of the Railroad and Warehouse Commission is disqualified for bias. It may be too much to expect that administrative officials should conduct themselves with the decorum expected of trial judges, but due process does involve an element of fair play and an opportunity for a fair hearing, and, when conduct of administrative officials becomes so unfair that litigants are deprived of the opportunity to fairly present their evidence or be heard, it becomes the duty of the courts to nullify an order based on such hearing for lack of due process. Were it not for the fact that, after careful consideration of the voluminous record in this

case, we have come to the conclusion that other members of the commission did give the railway company an opportunity to submit its evidence, probably under some difficulty, we would be inclined to reverse for lack of due process. On appeal, the trial court also gave the railway company a further opportunity to submit whatever additional evidence it desired to submit. While this case comes perilously close to the point where an administrative hearing cannot be upheld, we reluctantly conclude that it should not be reversed because of the misconduct of one of the members of the commission.

■ The next contention of the railway company is that the order to show cause involved only a hearing for a determination of whether the same trains abandoned under the first order should be reestablished and that the railway company had no notice that the commission contemplated making an order requiring establishment of service on a reverse schedule. With this contention we have much difficulty. In Morgan v. United States, 304 U. S. 1, 18, 58 S. Ct. 773, 776, 82 L. ed. 1129, 1132, the United States Supreme Court said:

"* * * The right to a hearing embraces not only the right to present evidence but also a reasonable opportunity to know the claims of the opposing party and to meet them. The right to submit argument implies that opportunity; otherwise the right may be but a barren one. Those who are brought into contest with the Government in a quasi-judicial proceeding aimed at the control of their activities are entitled to be fairly advised of what the Government proposes and to be heard upon its proposals before it issues its final command."

We think that it is elementary that due process does embrace notice of the claims to be investigated or litigated and an opportunity to present evidence on the issues to be determined. Did the railway company have such opportunity here? The order to show cause is entitled:

"In the Matter of the Investigation of the Reestablishment of Service by the Duluth, Missabe and Iron Range Railway Company of its Passenger Trains Nos. 1, 2, 11, 12 and 14 and Bus Service

Contributory to Trains Nos. 1 and 2 between Wilpen and Buhl, Minnesota."

The order to show cause itself provides:

"That the Duluth, Missabe and Iron Range Railway Company show cause why it should not be required to *reestablish* the passenger train service hereinabove referred to until such further or different order of the Commission is issued in the premises; * * *." (Italics supplied.)

All further papers in the proceeding bore the same title as the order to show cause. The final order did not require the railway company to reestablish the abandoned service but, on the contrary, required establishment of a different type of service. We have no doubt that the commission has power under our statute to order the establishment of service on a different schedule than that which formerly existed. The question here is more vital than that. It involves the fundamental issue of whether the railway company was advised of the commission's intention to investigate establishment of a different type of service and whether the railway company has had an opportunity to be heard on that issue.

While the bulk of the record consists of evidence pertaining to the loss incident to the operation of the abandoned trains, the passengers using the trains on the old schedule, and the lack of necessity for such service, there is much evidence relating to the possible results of service on a reverse schedule, both on direct and cross-examination of witnesses, and particularly in the later hearing. Taking the record as a whole, we think that the evidence sustains the court's finding that the railway company must have known that the commission was considering the establishment of service on such reverse schedule. Practically all the witnesses called in support of the reestablishment of the train service testified that they were of the opinion that the train would be used by many more people if the schedule was reversed. It would be difficult, if not impossible, to present concrete evidence of such use until the train has been in service for a reasonable period of time. The trial court was of the opinion that the commission was within its jurisdiction if it con-

sidered the reestablishment of service desirable, "at least on an experimental basis," for a reasonable period of time. We are inclined to agree. If, after a reasonable trial period during which the railway company genuinely tries in good faith to render service contemplated by the order, the public does not show interest in such service, it is reasonable to assume that the commission may look more favorably upon a new petition to abandon the service.

The railway company claims that it is impossible to comply with the commission's order with respect to the time allotted for running the train on the schedule ordered. We assume that it may be necessary to provide more modern equipment than that heretofore used. However, the order of the commission is prima facie reasonable on appeal. The evidence to show impossibility of performance is not convincing. If it develops, after a fair trial period, that it in fact is impossible to comply with the order, we have no doubt that, on a proper showing, relief may be procured from the commission. At least the showing made here is insufficient to invalidate the order on that ground.

The trial court failed to specifically make any finding that the order of the commission was reasonable and lawful. We believe that such finding is implicit in the court's affirmance.

We have examined all other questions raised by the railway company. They require no further discussion than is contained above.

Affirmed.